IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON C. HULSE                                                                                          PLAINTIFF

v.                             Civil No. 5:15-cv-05285

SOUTHERN HEALTH PARTNERS,                                                          DEFENDANTS
INC. and ROBYN SIMS

**OPINION**

Plaintiff, Jason C. Hulse, filed this action pursuant to 42 U.S.C. §1983. He proceeds *in forma pauperis*. Although he was proceeding *pro se* when he filed the original Complaint, an attorney then entered an appearance on his behalf (ECF No. 6).

The case is before the Court on the Motion for Summary Judgment (ECF No. 76) filed by the Defendants. Plaintiff has responded (ECF No. 82) to the Motion. Additionally, Defendants have filed a reply (ECF No. 84). The Motion is now ready for decision.

Plaintiff maintains he was denied adequate medical care while incarcerated at the Washington County Detention Center (WCDC). Specifically, he contends Defendants had a custom or policy of denying medical treatment to inmates on the basis that the inmate was awaiting transfer to the Arkansas Department of Correction (ADC).

I. BACKGROUND

On April 14, 2015, Plaintiff was involved in a motorcycle accident. (ECF No. 82-5). He was arrested and various charges were filed against him including possession of drugs and driving while intoxicated (DWI). (ECF No. 78-1 at 4). A parole violation was also lodged against him.

Following the accident, Plaintiff was treated at the Northwest Medical Center for injuries including head pain, shoulder pain, and a laceration across his right knee. (ECF No. 82-4). He was discharged in the early morning hours of April 15, 2015, with a prescription for an antibiotic, Bactrim, and a pain reliever, Norco. *Id.*

Plaintiff was then booked into the WCDC. (ECF No. 78-1 at 4). Plaintiff testified that he repeatedly asked to see a nurse before he was booked in. (ECF No. 82-5 at 36). He wanted to request follow-up medical treatment and ask when he would start receiving his pain medication and antibiotics. *Id.* at 37. He indicates he was told several times that he would be screened by the medical company before he was put in a regular jail cell. *Id.* at 36. Plaintiff testified that when this did not occur, he began asking the nurse at pill call for medical care. (ECF No. 82-5 at 42).

Plaintiff never received the pain medication and was told it was a non-narcotic facility. (ECF No. 82-5 at 49). He did not receive the antibiotics until after his stitches were taken out on April 28, 2015. *Id.* at 50. His knee became infected and it took about a week for it to clear up. *Id.* at 52-53.

He was convicted of a parole violation on May 5, 2015. Plaintiff was sentenced to serve time in the ADC and was being housed at the WCDC awaiting transfer. (ECF No. 78-1 at 2); (ECF No. 82-5 at 82-83). He remained incarcerated at the WCDC until January 11, 2016, when he was transferred to the ADC. (ECF No. 78-1 at 5).

Southern Health Partners, Inc. (SHP), became the contract medical care provider for inmates at the WCDC on November 1, 2014. (ECF No. 78-1 at 1). The doctors and nurses providing medical services at the WCDC were employees or agents of SHP.

The ADC has had in place since August 29, 1991, a policy that requires medical care professionals in Counties housing ADC inmates to obtain prior approval for treatment or medical services for a condition that is routine or non-life threatening. (ECF No. 78-1 at 2 & ECF No. 78-2 at 1).

On September 15, 2015, ADC's Administrator of Medical and Dental Services sent a memorandum to Arkansas County Sheriffs and Jail Administrators explaining the process for an eligible jail detainee to access medical and dental services through the ADC. (ECF No. 78-1 at 2 & 78-3). The memorandum states in part:

> A jail inmate is eligible for necessary medical and dental services' claims to be paid by the ADC if the services are provided specifically for the ADC inmate by an off-site provider. If the jail has contracted for a provider to see ADC inmates at the jail, and the services are not provided to detainees or inmates who are not ADC inmates, such services will be considered off-site medical or dental services. ADC will not pay claims for services provided to all detainees, inclusive of those not sentenced to ADC.

(ECF No. 78-3 at 1).

After his arraignment, which Plaintiff believes occurred on April 17, 2015, a guard tried to get Plaintiff medical assistance but was informed to just tell the Plaintiff to put in a medical request. (ECF No. 82-5 at 41). On April 18, 2015, Plaintiff submitted a medical request asking to have a nurse check his stitches.[1] (ECF No. 79-8 at 1). On April 19, 2015, he submitted a medical request asking why he had not been screened by a nurse, that he needed his stitches checked, and asking when he would be getting his antibiotics. *Id.* On April 22, 2015, Nurse Loni Plumlee responded: "added to nurse call." *Id.* Plaintiff was seen by the nurse on April 24, 2015, or April 25, 2015. (ECF No. 82-5 at 46). No treatment or chart notes were provided with respect to any nurse visits.

---

[1] Plaintiff does not contend that either Defendant is liable for his knee laceration or the failure to timely remove his stitches. (ECF No. 82 at 10).

3

On April 27, 2015, Plaintiff submitted a medical request stating he had not been screened and his stitches were supposed to be taken out in seven days. (ECF No. 78-8 at 1). If medical staff could not see to his needs, Plaintiff asked to be transported to the hospital where he could receive proper care. *Id.* He submitted another request asking who he had to contact to file a complaint for negligent medical treatment. *Id.* at 2. Nurse Plumlee responded asking what his complaint was. *Id.*

On April 28, 2015, Plaintiff asked to be seen by the psych nurse. (ECF No. 78-8 at 2). In response, Nurse Plumlee said he had been added to the psych nurse list. *Id.*

On April 29, 2015, Plaintiff again asked to be added to the psych nurse list. *Id.* Plaintiff indicated there had been a misunderstanding and he believed a guard had put him down as refusing to see the nurse. *Id.* On April 29, 2015, Plaintiff submitted another request in which he stated he was supposed to have the dressing on his knee changed twice daily as a result of the stitches having to have been cut and torn out. *Id.* at 3. On May 1, 2015, Nurse Plumlee responded that he had been added to the treatment book and asked if Plaintiff's dressing had been changed since his April 29th request. *Id.* Plaintiff responded that he was given a large Band-Aid and ointment. *Id.*

On May 4, 2015, Plaintiff submitted a request asking to be seen by the doctor for a hernia. (ECF No. 78-8 at 3). On May 5, 2015, Plaintiff asked if he had been added to the doctor's list. *Id.* On May 6, 2015, his request was closed by Nurse Plumlee with a notation that Plaintiff had been seen by the nurse. *Id.* Plaintiff responded by saying he needed to be seen by the doctor not the nurse. *Id.*

On May 7, 2015, Plaintiff again asked to see the psych nurse. (ECF No. 78-8 at 4). On May 13, 2015, Nurse Plumlee indicated Plaintiff had been added to her list. *Id.*

4

On May 8, 2015, Plaintiff complained that he had previously been seen on April 24th by the same nurse who was on duty that evening. (ECF No. 78-8 at 4). Plaintiff stated he wanted to request that the "hateful[]" nurse not have anything to do with him. *Id.* He stated he wanted to be seen by a doctor not a nurse. *Id.* He also indicated his hernia was getting bigger. *Id.* In response, he was told he was on the doctor list for that Friday, May 15th. *Id.*

On May 9, 2015, Plaintiff complained about the delay in his treatment and the manner in which he was treated by the one nurse. (ECF No. 78-8 at 5). He indicated again that he had a hernia that was getting progressively worse and asked to be seen by a doctor. *Id.* If no doctor was available, he indicated he wanted to go to the hospital. *Id.*

On May 10, 2015, Plaintiff submitted another request about his hernia. (ECF No. 78-8 at 3). He indicated it had grown in size and was painful. *Id.* Plaintiff stated he wanted to see the doctor ASAP. *Id.* On May 12, 2015, Nurse Plumlee responded that he was on the doctor's list for Friday, May 15th. *Id.*

On May 11, 2015, Plaintiff submitted two requests asking that his hernia issue be addressed. (ECF No. 78-8 at 6). He indicated it was bulging more and burning. *Id.* On May 20, 2015, Nurse Plumlee responded: "Sir, since you are an ADC inmate, ADC has to approve any Dr. visits with our doctor here or an outside doctor visit. [W]e are working with them to see how they want this handled. We will respond appropriately when we hear back from them." *Id.*

On May 13, 2015, Plaintiff was involved in an altercation with another inmate. (ECF No. 78-4 at 1). After several hours, during which time Plaintiff indicated he was bleeding from his nose and mouth, Plaintiff was transported to Washington Regional Medical Center. (ECF No. 82-5 at 61). Plaintiff was diagnosed with a fracture of the anterior wall of the left maxillary sinus. *Id.*; (ECF No. 78-5 at 3 & 10). He was to be rechecked by an Ear, Nose, and Throat (ENT) doctor,

Dr. Manning, the following week. (ECF No. 78-5 at 4 & 18). Plaintiff was prescribed Amoxicillin. *Id.* The emergency room did not prescribe anything for pain because he knew the WCDC was a non-narcotic facility. (ECF No. 82-5 at 67). He told Plaintiff that the doctor at the WCDC would give him something for pain. *Id.*

Plaintiff also asked the emergency room doctor to look at his hernia over the objections of the deputy who said he was not there for that issue. ECF No. 78-9 at 4. According to Plaintiff, the doctor examined it and said it was an umbilical hernia. *Id.* at 5.

Plaintiff testified that he never once got anything for the pain. (ECF No. 82-5 at 67). He indicated he asked the nurses at pill call every day for something for the pain. *Id.* When Plaintiff returned to the WCDC, Nurse Plumlee asked how he felt and he indicated he hurt (ECF No. 82-5 at 67-68. She said they would get him something for pain ASAP. *Id.* at 68. She also told him he was going to be put on medical lockdown so he could rest and heal up. *Id.*

SHP sent a request to the ADC regarding Plaintiff's treatment for his facial injury. (ECF No. 82-5 at 83). The ADC contact responded that Plaintiff would be fast-tracked. *Id.*

Plaintiff testified that for about a week his head was swollen, throbbing, and his nose was leaking blood. (ECF No. 82-5 at 68). The fact that his mat and blanket were taken away each day intensified the pain and headache. *Id.* at 69.

Plaintiff was told medical would have to authorize him to keep his mat and blanket. (ECF No. 82-5 at 69). Plaintiff was informed that he would see the doctor on Friday and could ask him about keeping his mat and blanket during the day and whether he could have some type of pain medication. *Id.* However, Plaintiff did not see the doctor. *Id.*

On June 1, 2015, Plaintiff indicated he would like to know the status of his medical treatment. (ECF No. 78-8 at 7). He noted he still had not been seen by the doctor about his

hernia. *Id.* Plaintiff indicated the hernia had gotten larger and more painful. *Id.* He also indicated he had been referred to an ENT specialist by the emergency room doctor due to the "face fracture over my sinus cavity." *Id.* He also complained that he had never even been given Tylenol despite having a "broken face." *Id.* This request was not responded to until June 16, 2015, when Nurse Robyn Sims asked if this was still a problem. *Id.*

Plaintiff testified that twice while he was at the WCDC, the hernia popped out and caused extreme abdominal pain. (ECF No. 82-5 at 85). He also indicated that after his facial injury he continually suffered sinus problems including infections. *Id.*

On June 4, 2015, Plaintiff asked what the ADC had decided about his medical treatment. (ECF No. 78-8 at 8). Plaintiff said he felt his requests for treatment were being ignored. *Id.* He indicated his hernia was getting progressively worse and noted he had never had his follow-up with an ENT doctor. *Id.* That day, Nurse Plumlee responded that the: "ADC wants to treat you down there for this, I do not know when that will be though." *Id.*

On June 10, 2015, Plaintiff indicated that since the ADC wanted to treat him at its facility, that he needed his transfer to be fast-tracked for medical reasons. (ECF No. 78-8 at 8). He pointed out he was referred to a specialist regarding his face fracture to see if it needed surgical intervention. *Id.* Further, he indicated his hernia was getting worse and was now twice the size and was causing a lot of abdominal pain. *Id.* On June 11, 2015, Nurse Plumlee responded: "ADCs response to me was that you will be fast tracked down there, however I do not [know] when or any other details about it." *Id.*

On July 17, 2015, Plaintiff stated he had let his mental health issues of depression and insomnia "ride" since the ADC wanted to treat him there but stated he was still at the WCDC and it was time to take his issues seriously. (ECF No. 78-8 at 9). On July 27, 2015, a notation was

7

made under this request that Plaintiff had refused nurse call that day. *Id.* On July 28, 2015, Plaintiff stated he had not refused nurse call and that he was in R block not F Block. *Id.* A notation was made that he was seen by the nurse on August 4, 2015. *Id.*

On July 18, 2015, Plaintiff asked whatever happened to him being fast-tracked. (ECF No. 78-8 at 9). He noted again that he had not been seen by the specialist; his hernia had not been treated; and, he had never been seen by a doctor. *Id.* On August 7, 2015, Nurse Sims responded: "we will check with ADC again." *Id.*

On September 9, 2015, Plaintiff asked for something for his allergies. (ECF No. 78-8 at 9). He was added to nurse call. *Id.*

Plaintiff submitted a second request on September 9, 2015, asking whatever happened with the follow-up with the specialist. (ECF No. 78-8 at 10). He noted he was having crazy sinus and allergy issues. *Id.* He also asked what happened to him being fast-tracked. *Id.* On September 11, 2015, Nurse Sims responded: "We are still waiting for ADC to approve." *Id.*

On September 22, 2015, Plaintiff complained of acid reflux/heart burn and noted he had been on Zantac before. (ECF No. 78-8 at 10). He was added to nurse call. *Id.*

On December 25, 2015, Plaintiff submitted a request noting that he threw his back out. (ECF No. 78-8 at 10). He indicated it felt like he slipped a disc. *Id.* He stated he could barely walk and was in extreme pain. *Id.* In response, Nurse Sims stated he was added to the doctor's list and that she had added Naproxen to his medication list *Id.* The following day, Plaintiff indicated he had been told there was not going to be a doctor call. *Id.* He asked what the plan was and whether Nurse Sims had talked to the doctor and got something ordered that would give him some relief from the pain. *Id.* Nurse Sims responded: "the day nurse did we are waiting on pharmacy to deliver it." *Id.* at 11.

8

On December 29, 2015, Plaintiff stated he had never received the medication and was still in a lot of pain. (ECF No. 78-8 at 11). He also noted that the doctor was there the day before but he had not been seen. *Id.* Nurse Regina Walker responded that he had Naproxen ordered for him and he could have it twice a day for pain but that he had to go to med call to receive it. *Id.*

On December 29, 2015, Plaintiff asked where the medication, Prednisone, was that the doctor had ordered on Saturday. (ECF No. 78-8 at 11). Plaintiff also asked why he had not been seen by the doctor when he was there. *Id.* On January 2, 2016, Plaintiff was told he was on the med call list. *Id.* Plaintiff testified he never saw a doctor at the WCDC during his incarceration there. (ECF No. 82-5 at 86-87).

As noted above, Plaintiff was transferred to the ADC on January 11, 2016. His initial report of physical examination states "no obvious umbilical hernia, small area above the naval that may be questionable." (ECF No. 78-7 at 2). Note was made that he should be seen by an ENT due to the May 2015 altercation and nothing having been done to fix the facial fracture. *Id.*

On January 19, 2016, a radiology report states: "The osseous structures are unremarkable including grossly intact orbital rims. Maxillary sinuses are unremarkable. No blowout fracture is seen. Conclusion: Normal facial series." (ECF No. 78-7 at 7). Plaintiff was treated with antihistamines and allergy medications for his allergy symptoms. (ECF No. 78-9 at 6). Plaintiff testified he had constant sinus issues—constant drainage at night. *Id.* at 7.

Plaintiff received no further treatment for the hernia. During his deposition, the Plaintiff testified that they thought he was just trying to get out of work when he reported the hernia. (ECF No. 78-9 at 2); (ECF No. 82-5 at 88-89). The doctor said they would just keep an eye on the hernia and not treat it unless "it pops out or gets stuck." *Id.*

On August 1, 2016, Plaintiff underwent a nasal endoscopy due to a nasal obstruction post facial trauma. (ECF No. 82-7 at 2). The findings were: "The septum deviates to the left side. Left septal spur. Right nasal vestibulitis.[2] Examination of the left side revealed a clear middle meatus[3] and sphenoethmoid recess[4]. . . . Examination of the right side revealed bloody crusting anteriorly and thick clear drainage." *Id.* It was noted there were "no mucopurulence or polyps" on either side. *Id.* Plaintiff was advised to start saline washes daily, continue nasal steroid spray, and antihistamine nasal spray daily. *Id.* at 3. He was to apply mupirocin ointment intranasally twice a day for ten days. If there was no improvement, a CT scan would be performed in two months. *Id.*

On October 31, 2016, a maxillofacial CT was performed. (ECF No. 82-7 at 5). The diagnostic impression was listed as: "No sinus fluid to indicate acute sinusitis; mucosal thickening occupies both spheno-ethaoidal recesses. Deviated nasal septum with a prominent bony spur measuring 6.5 mm extending up to the lateral wall of the nasal cavity on the left." *Id.* No signs of fracture were evident. *Id.* at 7. Surgery as an option was discussed. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any

---

[2] Nasal vestibulitis is a minor infection at the opening of the nose. The usual cause is the bacteria Staphylococcus. http://www.merckmanuals.com/home/ear,-nose,-and-throat-disorders/nose-and-sinus-disorders/bacterial-nasal-infections (accessed October 4, 2017).

[3] "[A]ny of the four passages in the nasal cavity formed by the projection of the conchae." http://www.medilexicon.com/dictionary/53314 (accessed October 2, 2017).

[4] "[A] small cleft like pocket of the nasal cavity above the superior concha into which the spenoid sinuses drain." http://www.medilexicon.com/dictionary/76442 (accessed October 2, 2017).

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

11

**(A). Medical Care**

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). The Eighth Circuit applies the deliberate indifference standard to both pretrial detainees and convicted inmates. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)(internal quotation marks and citation omitted).

A Plaintiff "seeking to impose liability on a municipality [or an institution] under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Board of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 403 (1997). "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted); *Jenkins v. County of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009)(Plaintiff

must point to "any officially accepted guiding principle or procedure that was constitutionally inadequate").

**(B). Serious Medical Need**

Defendants argue Plaintiff's alleged hernia did not constitute a serious medical need. In fact, Defendants argue the medical evidence establishes Plaintiff did not have a hernia when he was booked into the WCDC on April 15, 2015, or when he underwent an intake physical at the ADC on January 11, 2016.

The Defendants reach the conclusion that Plaintiff did not have a hernia by ignoring Plaintiff's testimony that both the emergency room doctor and the doctor that he saw at the ADC after his initial evaluation agreed he had an umbilical hernia. The emergency room doctor did not address the issue of treatment. Plaintiff was never seen by the SHP. The ADC doctor determined the hernia should just be followed. It is therefore conceivable that the hernia does not constitute a serious medical need. *See e.g., Livingston v. Warren County*, No. 4:15-cv-01318, 2017 WL 2535699, *4 (E.D. Mo. June 12, 2017)(Plaintiff had umbilical hernia for almost twenty years before he entered the detention center and suffered no complications while there). However, this is an issue of fact that cannot be decided by the Court.

Furthermore, the record is clear that the facial fracture merited treatment at the emergency room and a referral to an ENT. Thus, Plaintiff did have at least one serious medical need during his incarceration at the detention center.

**(C). Custom or Policy**

Defendants argue no policy or custom of SHP caused the Plaintiff to suffer any unconstitutional harm. SHP states the ADC policy requires prior approval to be sought by medical professionals before rendering routine or non-life threatening medical services. Defendants

contend the process through which ADC approval must be obtained is based on Arkansas administrative and statutory law, and such policies and procedures are enforced by the ADC.

Specifically, Defendants note that Ark. Admin. Code 004.00.2-810 states in relevant part that: "[i]llness or injury requiring medical care to an individual in the custody of the county shall be reported as promptly as possible to the Administrator of Medical Services, who will approve the treatment to be rendered and/or recommend transfer to the Department of Correction." Based on this, and Ark. Code Ann. § 12-27-114, Defendants argue it is the State of Arkansas that established the policy and had final authority regarding such matters. SHP states it merely follows Arkansas law.

This statutory provision, Ark. Admin. Code 004.00.2-810, "[e]stablishes the criteria for payment of certain medical expenses, incurred with prior approval, associated with emergent medical needs for eligible felons serving sentences or assigned to designated programs in county jails, and outlines the procedures to be followed by counties submitting such bills for payment." Ark. Admin. Code 004.00.2-810(II). Felons become eligible under the statute thirty days after the signing of the commitment order. *Id.* at IV(A). Emergent medical need is defined as "[i]llness or injury which threatens life or limb, causes undue or avoidable suffering, subjects the individual to further risk, or is likely to cause deterioration of health status if not promptly treated. Health conditions resulting from injuries or illnesses preceding eligibility . . . and chronic conditions do not qualify, unless the condition presents an emergent threat as defined above." *Id.* at IV(C). The County or the individual is responsible, and will not be reimbursed for, "[r]outine care for preexisting conditions." *Id.* at VI(C).

Defendants also rely on Ark. Code Ann. § 12-27-114 which likewise deals with reimbursement of the County for medical care provided to ADC committed inmates. It provides

14

that the County may seek reimbursement "for the actual costs paid for any emergency medical care for physical injury or illness of the inmate . . . if the injury or illness is directly related to the incarceration and the county is required by law to provide the care for inmates in the jail." Ark. Code Ann. § 12-27-114(c)(1). Except "[i]n a true emergency situation . . . . [r]eimbursements for medical expenses shall require prior approval of the Department of Correction or the Department of Community Correction before rendering of health care." *Id.* at (c)(3)(A) & (c)(3)(B)(i).

Plaintiff argues that SHP denied him medical care solely out of fear that it would not be reimbursed for any care provided. In fact, Plaintiff points out that SHP follows this same course of action for the entire class of inmates awaiting transfer to the ADC. In Plaintiff's words, SHP "pretty well just pass[es] the buck around to where [it does not] get stuck footing the bill on something maybe or liable for something in a way, medical treatment, but [it] just kind of pass[es] it around until you get shipped off to [ADC]." (ECF No. 82-5 at 99). Plaintiff argues that SHP cannot escape liability because it did not write the policy at issue.

The Court agrees with Plaintiff. There is a genuine issue of material fact as to whether SHP is liable to the Plaintiff for refusing medical treatment to him based on an ADC policy dealing with reimbursement of medical expenses for ADC committed inmates. In the *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239 (1983), the Massachusetts General Hospital (MGH) sought to recover from the City of Revere costs of medical care provided to an individual wounded while fleeing from the City police. *Id.*, 463 U.S. at 240. The police officers summoned a private ambulance which took the individual to MGH. *Id.*

The Court noted that both the Due Process Clause and the Eighth Amendment required the responsible governmental agency to provide medical care to persons injured while being

15

apprehended and those in its custody. *Id*., 463 U.S. at 244. "If . . . the governmental entity could obtain the medical care needed for a detainee only by paying for it, then it must pay." *Id*., 463 U.S. at 245. However, the Court noted there were "other means by which the entity could meet its obligation" to provide medical care. *Id.* It concluded that "as long as the governmental entity ensures that the medical care needed is in fact provided, the Constitution does not dictate how the cost of that care should be allocated as between the entity and the provider of the care. That is a matter of state law." *Id*. The Court clearly stated that "the injured detainee's constitutional right is to receive the needed medical treatment; how the [governmental entity] obtains such treatment is not a federal constitutional question." *Id*.

Thus, regardless of whether or not it was entitled to seek reimbursement from the ADC, SHP, as the contract medical care provider for the WCDC, assumed the constitutional obligation to provide needed medical treatment to detainees. If SHP refused treatment or delayed necessary medical treatment to the Plaintiff so that it would be entitled to reimbursement from the ADC, this may well constitute a custom, policy or practice of SHP.

**(D). Nurse Sims**

Nurse Sims was the Medical Team Administrator at the WCDC. (ECF No. 78-1 at 1). As such, Defendants state her duties primarily consisted of scheduling the staff and other administrative functions. *Id.* Nurse Sims states she never provided any direct patient care to the Plaintiff and never sent requests to the ADC seeking approval of medical care or fast tracking for the Plaintiff. *Id*. In fact, Nurse Sims indicates her contact with the Plaintiff was limited to answering several kiosk entries. *Id.*

Nurse Sims started working at the WCDC in May or June of 2015 and quit working there in January of 2016, when SHP lost its contract. (ECF No. 82-8 at 6-7 & 9-10). In addition to

her administrative duties, she filled in for other staff if someone called in or did not show up. *Id.* at 9. All medical team members were responsible for answering some requests each day. *Id.* at 11. They attempted to have nurse call on a daily basis. *Id.* at 13. Doctor call was held once a week. *Id.* at 14.

Inmates could not directly contact the doctor. (ECF No. 82-8 at 14). A nurse would put an inmate on the doctor's list if the inmate had a medical issue that was outside the nurse's scope, such as needing prescription medication. *Id.* According to Nurse Sims, inmates could be seen by SHP's doctor, Dr. Saez, without ADC approval but could not be sent to an outside doctor. *Id.* at 15. Further, if medication was prescribed, ADC approval was required. *Id.* at 18. It was the responsibility of nursing staff to seek ADC approval. *Id.* If it was a non-ADC inmate, the jail administrator would have to approve referrals to outside doctors. *Id.* 19. In the event of an emergency, such as a broken bone or profuse bleeding, an inmate, whether or not an ADC inmate, could be sent for treatment outside the facility. *Id.* at 20.

Her first communication with Plaintiff occurred on June 16, 2015. Nurse Sims asserts the decision to send an inmate to an outside provider was solely within the discretion of the attending physician. (ECF No. 78-1 at 3). In sum, Nurse Sims argues she followed up with the Plaintiff and ADC about the status of his requests and provided appropriate and sufficient responses given the non-serious nature of his medical conditions and her absence of authority to refer Plaintiff to an outside provider.

However, Nurse Sims had the authority to have Plaintiff seen by the jail doctor. She did not do so despite his repeated medical requests and his complaints of pain. She responded to several of his requests indicating SHP was waiting on ADC approval. She offered no form of treatment, not even an over the counter medication which she testified they typically had

17

available at the facility and could be authorized by a nurse. There are genuine issues of material fact as to whether Nurse Sims exhibited deliberate indifference to Plaintiff's serious medical needs.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (ECF No. 76) is **DENIED.** This matter will be scheduled for a jury trial.

IT IS SO ORDERED on this 5th day of October 2017.

/s/ P.K. Holmes, III
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE